Filed 10/6/21  In re Saul A. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re SAUL A., a Person Coming Under the Juvenile Court Law. | B309200<br>(Los Angeles County<br>Super. Ct. No. 19CCJP07245) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen Marpet, Juvenile Court Referree. Conditionally reversed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant A.M. (mother) appeals from the juvenile court's orders summarily denying her Welfare and Institutions Code[1] section 388 petition requesting family reunification services with her child, Saul A. (born 2019), and denying her request for a contested section 366.26 hearing. Mother also challenges the juvenile court's findings under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law. She contends the juvenile court and the Los Angeles County Department of Children and Family Services (the Department) failed to comply with their statutory duties of inquiry and notice.

The juvenile court did not abuse its discretion by summarily denying mother's section 388 petition and her request for a contested section 366.26 hearing. The Department failed, however, to adequately investigate Saul's father's claim[2] regarding possible Indian ancestry, and the juvenile court failed to ensure an appropriate inquiry had been conducted before concluding ICWA did not apply to these proceedings. We therefore conditionally reverse the juvenile court's section 366.26 orders and remand the matter for the limited purpose of directing the juvenile court to conduct an inquiry into Saul's possible

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Saul's father is not a party to this appeal.

Indian status, and if warranted, to provide proper notice under ICWA.

## BACKGROUND

**Child welfare history**

Mother's child welfare history included three prior cases in which she failed to reunify with her children, resulting in termination of her parental rights.

In 2006, mother's mental and emotional problems resulted in dependency jurisdiction over minor D.W. Mother failed to reunify with D.W., and her parental rights were terminated in 2007.

In 2011, mother's substance abuse and mental and emotional problems led to dependency jurisdiction over minor M.M. The juvenile court denied mother reunification services pursuant to section 361.5, subdivision (b)(10) and (11), and terminated her parental rights in 2013.

In 2014, mother's mental and emotional problems and her failure to take prescribed psychotropic medication resulted in dependency jurisdiction over minor Xavier M. Mother was granted reunification services but failed to reunify with Xavier. Her parental rights were terminated in 2015.

**Current case**

The Department received a referral in 2019 that mother's mental health issues, history of substance abuse, and homelessness placed newborn Saul at risk of harm. The referral noted that mother was exhibiting mental health problems, including rambling and incoherent speech.

Mother told the Department's responding social worker that she was homeless but planned to live with Saul at the Union

Rescue Mission when discharged from the hospital. She said Saul's father was a musician and was currently out of town and could not be contacted.

Mother said she had been diagnosed with schizoaffective personality disorder, was under the care of a psychiatrist, and took prescribed medication. She experienced mental health relapses in six-month intervals and was last hospitalized a year ago. Mother told the social worker she had completed a dual diagnosis program for mental health and substance abuse and had last used methamphetamine a year ago. She hoped to find another dual diagnosis program.

The Department confirmed that mother had completed a dual diagnosis program in September 2019; however, the program staff said mother had not been invited to stay because of her behavioral issues. The staff said mother was not compliant with her medication and engaged in "somewhat violent behavior." She fought with staff and other residents, broke things, and acted out in the presence of children. The program staff further reported that mother had been homeless for 15 years and that Saul's father was a chronic substance abuser and currently incarcerated.

Mother's psychiatrist reported that she had last seen mother on August 28, 2019. Mother was experiencing auditory hallucinations that "tell her negative stuff." She failed to attend two subsequent psychiatric appointments. The psychiatrist expressed concerns about mother's ability to care for newborn Saul, as mother's psychotropic medication had a sedating effect.

In October 2019, the social worker interviewed the paternal grandmother, who reported that father had been homeless for 10 years. She expressed concerns about mother's mental health but

4

was unaware of any diagnosis.  The paternal grandmother was also concerned about mother's continued association with father because of his ongoing homelessness and drug use.

In November 2019, the Department executed a removal warrant for Saul and filed a petition under section 300, subdivisions (b)(1) and (j).  The petition alleged that mother's mental health issues and both parents' substance abuse issues placed Saul at risk of serious physical harm.

Mother was present at the November 2019 detention hearing when the juvenile court ordered Saul detained from both parents.  Father appeared in custody at a hearing held on November 18, 2019, at which the juvenile court found him to be Saul's alleged father and granted father's request for a DNA test to determine paternity.

Subsequent DNA testing confirmed that father was Saul's biological father.  Father was released from custody in March 2020.  His whereabouts thereafter became unknown.

**Father's ICWA claim**

On November 18, 2019, father filed an ICWA-020 parental notification of Indian status form.  He checked the box on the form indicating Saul may be a member of, or eligible for membership in, a federally recognized Indian tribe.  He identified the tribe as Blackfoot.  Father also provided the name and telephone number of the paternal grandmother and indicated she had additional information.

The juvenile court acknowledged father's ICWA filing and asked father if he knew whether the paternal grandmother was registered with any tribe.  Father responded, "I don't.  I was just told when I was young that."  Father then stated:  "Cherokee." The juvenile court found it had no reason to know that Saul was

5

an Indian child but instructed the Department "to follow up with the paternal grandmother . . . [¶] . . . [¶] . . . And address whether she has any additional information. If she does, the Department needs to walk it on and we'll address those issues when we come—they need to walk it on to get authorization by the court to notice any tribes."

**Jurisdiction and disposition**

Mother told the Department she was diagnosed with schizoaffective disorder in 2010 and that she took psychotropic medication and participated in mental health services off and on since her diagnosis. Mother admitted using marijuana since age 20 and said she sometimes used methamphetamine in lieu of psychotropic medication. Mother said she had been involuntarily hospitalized seven times.

The Department reported that mother had completed a residential drug treatment program in February 2020 and was participating in an outpatient program. Mother's on-demand drug tests in April, May, and June 2020 were all negative.

On March 6, 2020, mother had an in-person with visit with Saul, who was placed with a paternal aunt in San Diego. Mother was appropriate, and there were no reported concerns. Because of COVID-19, mother's visits were changed to video or telephonic visits at the end of March 2020.

The Department learned in May 2020 that mother was not under the care of a psychiatrist but was obtaining her prescribed psychotropic medication at an urgent care facility. The Department encouraged mother to seek regular psychiatric care at a mental health clinic.

On May 8, 2020, the dependency investigator received a telephone call from mother, who was agitated and upset. Mother

became hostile, "went on a disorganized tangent," and yelled at the investigator, causing the investigator to suspect that mother had ceased taking her psychotropic medication.

In June 2020, the paternal aunt reported that mother's telephonic visits had become inconsistent. During the visits, mother seemed more interested in talking about father and their relationship issues. The paternal aunt stated that father was homeless and living in a tent, but that he and mother were often together.

Mother was present at the contested jurisdictional hearing held in June 2020. Father was absent. The juvenile court sustained the section 300 petition as to all counts, finding that mother's history of mental health and substance abuse issues, mother's failure to reunify with Saul's half-siblings because of those issues, and father's substance abuse placed Saul at risk of harm. The court continued the disposition hearing to determine whether the parents would receive family reunification services.

In a July 2020 telephone call, mother screamed at the Department's social worker and demanded transportation funds for visits with Saul, despite the fact that mother had received funds for four visits but had visited Saul only once. The social worker arranged to meet with mother at a nearby coffee shop at 3:00 p.m. Mother arrived at 7:00 a.m., waited a few hours, and then said she had to leave because it was raining.

The paternal aunt informed the social worker in July 2020 that mother's telephonic visits with Saul remained inconsistent. Mother often cancelled, claiming she was doing laundry, praying, or forgot to call.

Mother was present and testified at the July 29, 2020 dispositional hearing. Father was absent. The juvenile court

ordered Saul removed from parental custody and denied mother family reunification services pursuant to section 361.5, subdivision (b)(10) and (11).  The court accorded mother monitored visitation.

***Status review reports***

In November 2020, the Department reported that Saul remained placed with his paternal relatives and was very attached to them.  The paternal relatives said they wanted to adopt Saul.

During an in-person visit with mother on September 13, 2020, Saul cried and refused to go to mother.  The caregivers reported that mother did not know how to engage Saul and that she was on her phone during the entire visit.  The caregivers told the social worker they were not comfortable monitoring mother's future visits with Saul.  According to the caregivers, mother frequently criticized their parenting style and attempted to dictate what they could and could not give the child.  The caregivers further reported that Saul often woke up crying after his visits with mother.

During an in-person visit with mother on October 18, 2020, Saul would not allow mother to touch him or hold him.  Mother stated, "you know what he's telling me, he's telling me he made his decision he wants to stay with his auntie."  Mother was upset that Saul refused to interact with her and ended the visit 40 minutes early.

During an October 21, 2020 virtual visit, Saul cried as soon as he saw mother's face.  Mother repeatedly yelled at Saul, "[L]ook at me!"  "Look at me when I'm talking to you . . . !" (Capitalization omitted.)  Mother missed 20 telephonic visits with Saul between August and October 2020.

***Section 388 petition***

On November 22, 2020, mother filed a section 388 petition requesting family reunification services. Mother's petition stated that her changed circumstances included consistent participation in mental health services, attending 35 sessions; enrollment in an outpatient drug rehabilitation program in August 2020 and eight negative drug tests; and consistent, positive visits with Saul. Mother's petition further stated that it was in Saul's best interests "to be raised and cared for by his mother who gave birth to him."

The juvenile court summarily denied mother's section 388 petition on November 24, 2020, finding an insufficient change of circumstances to warrant an evidentiary hearing.

***Section 366.26 hearing***

At a November 24, 2020 hearing, mother's counsel asked the court to set a contested section 366.26 hearing. When asked for an offer of proof, counsel stated, "Mother has been actively involved in her mental health services. She is—she is, as well, visiting the minor. She's having in person visits now with her child and they do appear to be going well. Mother—there has been some issues, overall the visits have been consistent. I'm asking that this matter be set for contest so mother can testify as to the child sibling bond."

The juvenile court denied the request for a contested hearing, finding "based on the reports, that the visits have been virtual and/or monitored and infrequent, at best, and I am finding that—I'm denying the request for a hearing as it doesn't rise to the level of the applicable statutes with regard to a mother/child bond."

After finding no exception existed, the juvenile court terminated parental rights and designated the paternal aunt and her husband as the prospective adoptive parents.

This appeal followed.

## DISCUSSION

### I. Section 388 petition

Section 388 provides in pertinent part: "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition . . . shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction.  [¶]  . . .  [¶]  (d) If it appears that the best interests of the child ... may be promoted by the proposed change of order . . . , the court shall order that a hearing be held . . . ."

Although section 388 does not explicitly so provide, courts have long held that the right to a hearing is triggered only if the petition makes a prima facie showing, consisting of facts demonstrating a genuine change of circumstances.  (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)  To require a hearing a parent must show changed, not merely changing, circumstances. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.)  In addition, the parent must present new evidence and

10

facts showing that the requested modification will promote the child's best interests. (*C.J.W., supra*, at p. 1079.) The petition must state facts that, if found to be true, would sustain a favorable decision. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

We review the summary denial of a hearing on a section 388 petition for abuse of discretion. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Under that standard, we will not disturb the decision of the juvenile court unless it was arbitrary, capricious, or patently absurd. (*Ibid.*)

The trial court did not abuse its discretion by summarily denying mother's section 388 petition. Mother's alleged change of circumstance was her enrollment in a drug treatment program three months before filing her section 388 petition, and her enrollment and participation in mental health services six months before the filing of her petition. Mother had a long history of mental health and substance abuse issues, resulting in chronic homelessness and her failure to reunify with three of Saul's half-siblings. The trial court did not in err concluding that mother's recent enrollment and participation in a drug treatment program and mental health services show changing, not changed, circumstances. "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D., supra*, 70 Cal.App.4th at p. 47.) Mother's assertions that her visits with Saul had been consistent and positive is unsupported by any evidence and contradicted by the record.

11

Mother also failed to show that the change of order would be in Saul's best interests. Her petition merely states that it is in Saul's best interest to be raised and cared for by mother and that he should be given the opportunity to reunify with her. This is insufficient. Saul has lived with his paternal aunt for the majority of his short life. He is bonded to his caregivers, who wish to provide a permanent home for him through adoption. Mother's visits with Saul were inconsistent, and during two in-person visits, Saul refused to allow mother to touch or hold him.

Mother failed to make a prima facie showing of changed circumstances or that a change of order would be in Saul's best interests. The juvenile court did not err by summarily denying mother's section 388 petition.

## II. Section 366.26 hearing

"'The selection and implementation hearing under section 366.26 takes place after the juvenile court finds that the parents are unfit and the child cannot be returned to them.'" (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611 (*Grace P.*).) When a parent fails to reunify with the child, and the juvenile court finds the child likely to be adopted, the burden shifts to the parent to show exceptional circumstances exist such that termination of parental rights would be detrimental to the child. (*Ibid.*) One such circumstance is when the parent has maintained regular visitation and contact with the child and the child would benefit from the parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).)

A juvenile court may require an offer of proof before allowing a contested hearing on the beneficial parental relationship exception to termination of parental rights. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122.) "The offer of proof must be specific, setting forth the actual evidence to be produced,

12

not merely the facts or issues to be addressed and argued." (*Id.* at p. 1124.) "[F]or example, an offer of proof containing the assertion of the *fact* that the parent had a close parent-child bond with the minor—without identification of a witness or witnesses who would so testify to that fact—would not be sufficient. [Citation.] Similarly, a proffer identifying a witness who would testify to a close parent-child bond, without including enough specifics of the substance of that testimony to establish both that the witness has evidence to offer and that he or she is competent to so testify, would also not meet the threshold of a valid offer of proof." (*In re A.G.* (2020) 58 Cal.App.5th 973, 1007 (*A.G.*).)

We review mother's challenge to the juvenile court's denial of her request for contested section 366.26 hearing under the abuse of discretion standard. (*Grace P., supra*, 8 Cal.App.5th at p. 611.) The record discloses no abuse of discretion. Mother's offer of proof failed to meet the applicable legal standards. It failed to set forth the actual evidence to be produced and identified no witnesses who could attest to a parent-child bond between mother and Saul. To the extent mother claims she herself was to be that witness, she failed to set forth the specifics and substance of her proposed testimony.

Mother's reliance on *Grace P.* and *A.G.* as support for her position is misplaced, as the offers of proof presented by the parents in those cases, unlike mother's, were specific and set forth the evidence to be produced. In *Grace P.,* the father offered to testify that during his regular visits with the children, he talked to them about school, redirected their behavioral issues, brought food for them, played with them, and told them he loved them. The father further stated that his child Grace would testify that she enjoyed the visits, that she wanted the visits to

13

continue, and that she saw father as a parental figure. (*Grace P., supra*, 8 Cal.App.5th at p. 610.)

In *A.G.*, the mother's offer of proof identified nine potential witnesses, including the minor's siblings and maternal grandparents, who would testify regarding the mother's continuous contact with the child, her relationship with him from his birth until detention, and the activities they engaged in during visits. The mother also offered to produce photographs and videotapes as evidence of the closeness of the parent-child bond. (*A.G., supra*, 58 Cal.App.5th at p. 1013.)

Mother's offer of proof in this case sets forth no evidence, identifies no witnesses, and includes no specifics concerning the substance of her proposed testimony. The juvenile court did not abuse its discretion by finding mother's offer of proof insufficient to warrant a contested section 366.26 hearing.

## III. ICWA

### A. *Statutory framework*

Section 224.2, former subdivision (e), in effect at the time father filed his ICWA parental notification of Indian status form and when the juvenile court made its section 366.26 findings and rulings,[3] provided in relevant part: "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable. Further inquiry includes, but is not limited to, all of the following: [¶] (1) Interviewing the parents, Indian custodian,

---

[3] Section 224.2, subdivision (e) was amended in 2020. That amendment became effective on September 18, 2020. (Stats. 2020, ch. 104, § 15.)

and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3.[4]  [¶]  (2) Contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility.  [¶]  (3) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.  Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.).  Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, former subd. (e).)

Appellate courts are divided as to the applicable standard for determining when the duty of inquiry arises under section

---

[4]      Section 224.3, subdivision (a)(5) lists the information that must be included in notices that must be sent to the minor's parents, Indian custodian, and tribe, when the court or social worker knows or has reason to know that an Indian child is involved.  That information includes the child's name, date and birthplace, the name of the tribe in which the child may be eligible for membership, names of the child's biological parents, grandparents, and great-grandparents, a copy of the section 300 petition, and information regarding the time, date, and location of any scheduled hearings.  (§ 224.3, subd. (a)(5).)

15

224.2, former subdivision (e). (Compare *In re Austin J.* (2020) 47 Cal.App.5th 870 (*Austin J.*) with *In re S.R.* (2021) 64 Cal.App.5th 303 (*S.R.*) and *In re T.G.* (2020) 58 Cal.App.5th 275 (*T.G.*).)

**B. Austin J.**

In *Austin J.*, the mother filed a parental notification of Indian status form stating that one of her children "'may have Indian ancestry,'" Cherokee, through a deceased maternal great-grandmother. The court concluded that the mother's statement that she "'may have Indian ancestry'" and had been told that the maternal grandmother "'had Cherokee [ancestry],'" together with a similar claim by a maternal great-aunt of possible "'Cherokee heritage'" were "insufficient to support a reason to believe" the subject minors were Indian children under ICWA. (*Austin J., supra*, 47 Cal.App.5th at p. 888.) The court noted that the mother "conspicuously did not check the boxes on her parental notification of Indian status forms that would have indicated that she or any of the children is or may be a member of, or eligible for membership in, an Indian tribe" (*id.* at p. 889), and held that section 224.2 imposed no duty to inquire further into the subject minors' status as possible Indian children (*Austin J.*, at p. 889).

The court in *Austin J.* reasoned that the "reason to believe" standard under section 224.2 requires a logical connection between facts and belief to trigger the duty to investigate. (*Austin J., supra*, 47 Cal.App.5th at p. 889.) "Information about a tribal connection that 'is too vague, attenuated and speculative' will not support a 'reason to believe'" a child is an Indian child. (*Id.* at p. 888.) The court reasoned that ICWA defines "Indian child" in terms of tribal membership, not Indian ancestry; hence, "Indian ancestry, without more, does not provide a reason to

16

believe that a child is a member of a tribe or is the biological child of a member." (*Id.* at pp. 888-889.)

The court in *Austin J.* further reasoned that legislation enacting section 224.2 (Assembly Bill No. 3176 (2017-2018 Reg. Sess.)), supported the court's narrow interpretation of when there is "reason to believe" a minor is an Indian child: "Even if we assume that the possibility of Indian ancestry may suggest the possibility of Indian tribal membership, that bare suggestion is insufficient by itself to establish a reason to believe a child is an Indian child. In the recent changes to California's ICWA-related law [(Assembly Bill No. 3176)], the Legislature removed the language, 'information suggesting the child is a member of a tribe or eligible for membership in a tribe,' from the list of circumstances that provided one with a 'reason to know' a child is an Indian child. Significantly, it did not add that language to a definition of the newly created 'reason to believe' standard for further inquiry. We will not infer its incorporation into that standard." (*Austin J., supra*, 47 Cal.App.5th at p. 889.)

## C. T.G.

The court in *T.G.* disagreed with the *Austin J.* court's "narrow reading of the nature and quality of information sufficient to trigger the duty of further inquiry." (*T.G., supra*, 58 Cal.App.5th at p. 294.) The court in *T.G.* acknowledged that ICWA defines "'Indian child' . . . in terms of tribal membership, not ancestry," but pointed out that "the question of membership is determined by the tribes, not the courts or child protective agencies." (*Ibid.*) The court noted that "the imposition of a duty to inquire that is significantly more expansive than the duty to provide ICWA notice is premised on the commonsense understanding that, over time, Indian families, particularly those

17

living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status. As a result, the information available at the outset of dependency proceedings will often be inadequate to ensure the necessary protection of the rights and cultural heritage of Indian children, Indian families and Indian tribes. [Citation.] General information from the family about its ancestry frequently provides the only available basis to believe an Indian child may be involved. [Citation.] Additional investigation may not develop further information establishing the need for ICWA notice, but it is essential to the enforcement of the court's and child protective agency's 'affirmative and continuing duty to inquire' to construe broadly the duty to make further inquiry." (*T.G., supra,* 58 Cal.App.5th at p. 295, fn. omitted.)

The court in *T.G.* rejected the *Austin J.* court's suggestion that Assembly Bill No. 3176 (2017-2018 Reg. Sess.) "was intended to weaken the robust requirements for making further inquiry established by then-existing case law." (*T.G., supra*, 58 Cal.App.5th at p. 295.) The court acknowledged that Assembly Bill No. 3176 modified the definition of "'reason to know'" and removed from that definition "'information suggesting the child is a member of a tribe or eligible for membership in a tribe.'" (*Ibid.*) Assembly Bill No. 3176 simultaneously expanded, however, the statutory language triggering the duty to make further inquiry from "'knows or has reason to know' to 'reason to believe an Indian child is involved.'" (*T.G.*, at p. 295.) Although the phrase ""'information suggesting'"" was not included in the new "'reason to believe'" standard, the *T.G.* court noted "it is difficult to understand how, as a matter of plain meaning, a parent's statement that she has been told she has Indian ancestry

18

through a particular tribe or a specific relative 'suggests' her child is eligible for tribal membership [citations], but does not also provide 'a reason to believe' the child may be eligible under the current statute." (*Id.* at pp. 295-296.)

The court in *T.G.* further noted that the 2020 amendment to section 224.2, subdivision (e), although not in effect during the proceedings at issue, "confirms the Legislature's view the 'reason to believe' standard requiring further inquiry concerning a child's possible status as an Indian child should be broadly interpreted." (*T.G., supra,* 58 Cal.App.5th at p. 296.) That amendment, which became effective on September 18, 2020, provides in a new subdivision (e)(1) to section 224.2: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (Accord, *T.G..*, at p. 296, citing Assem. Bill No. 2944 (2019-2020 Reg. Sess.) and Stats. 2020, ch. 104, § 15.)

**D.    S.R.**

The court in *S.R., supra*, 64 Cal.App.5th 303 also disagreed with "*Austin J.*'s narrow reading of the kind of information sufficient to trigger the duty of further inquiry" and agreed instead with the *T.G.* court's reasoning that an Indian child's eligibility for membership in a tribe "'is determined by the tribes, not the courts or child protective agencies.'" (*S.R., supra*, at p. 316.)

19

The parents in *S.R.* filed ICWA-020 forms at the time of the detention hearing indicating they did not know of any Indian ancestry. The children were subsequently placed with the maternal grandparents, who attended a permanency planning review hearing and completed a "family find" and ICWA inquiry form. The grandmother's form indicated she did not know if she had Indian ancestry but checked boxes stating the children had other unidentified relatives with Indian ancestry and had family members who lived on federal trust land, on a reservation, or on a rancheria or an allotment. The grandfather checked boxes on the form indicating ancestry with the Yaqui tribe of Arizona, and that the children had other relatives with Indian ancestry who had lived on federal trust land, on a reservation, on a rancheria, or an allotment. The grandfather also identified the children's great-grandmother, Virginia G., who lived with the grandparents, as a Yaqui ancestor. (*S.R., supra*, 64 Cal.App.5th at p. 310.) The court in *S.R.* concluded that this "very specific evidence of Indian ancestry . . . does provide reason to believe the children are Indian children, even if that evidence does not directly establish the children or their parents are members or eligible for membership." (*Id.* at p. 317.)

The court in *S.R.* noted that the 2020 amendment to section 224.2, subdivision (e) "confirms the 'reason to believe' standard requiring further inquiry should be broadly interpreted. [T]he Legislature amended the statute to specify '[t]here is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information *suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe.*' [Citation.] Those plain terms suggest a loose fit between

20

the information that requires further inquiry and the specific kinds of information that constitute 'reason to know' a child in dependency proceedings is an Indian child as defined by statute. The next sentence in the statute eliminates all doubt: 'Information suggesting membership or eligibility for membership includes, but *is not limited to,* information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d).' [Citation.] That new provision forecloses the narrow interpretation of what constitutes reason to believe advanced by the court in *Austin J.*" (*S.R., supra,* 64 Cal.App.5th at p. 317.)

### E.  *Further inquiry was required in this case*

In this case a parent has identified specific tribes as well as relatives who may have information about the child's connection to those tribes. We agree with the courts' analysis in *T.G.* and *S.R.* and find that the "reason to believe" standard triggering a duty of further inquiry under section 224.2 has been met in this case. Although the 2020 amendment to section 224.2, subdivision (e) discussed in *T.G.* and *S.R.* was not operative during the proceedings at issue here, that amendment confirms our conclusion on the facts present here. The Legislature has made clear that there is "reason to believe" a minor is an Indian child when there is specific information suggesting eligibility for tribal membership. (§ 224.2, subd. (e)(1).) That information need only indicate that a member of the child's extended family can inform the court that the minor is an Indian child. (§ 224.2, subds. (d)(1), (e)(1).)

The information provided by father in this case was sufficient to trigger a duty of further inquiry by the Department.

21

Father submitted an ICWA form that indicated Saul may be eligible for membership in a federally recognized Indian tribe. He listed the Blackfoot tribe and later mentioned the Cherokee tribe, identified the paternal grandmother as a source of further information, and provided her name and telephone number.  The juvenile court directed the Department to "follow up" with the paternal grandmother to determine whether she had any additional information.  The record does not indicate that the Department did so, despite the fact that the Department interviewed the paternal grandmother before father filed his ICWA-020 form.  Under these circumstances, the Department was required to further investigate father's claim regarding Saul's possible Indian status.  (§ 224.3, subd. (e).)  The matter must accordingly be remanded for compliance with the ICWA inquiry requirements, and if warranted, to provide notice to the applicable tribes.  (*In re J.D.* (2010) 189 Cal.App.4th 118, 124.)

## DISPOSITION

The section 366.26 orders of the juvenile court are conditionally reversed.  The matter is remanded to the juvenile court for full compliance with the inquiry, and if warranted, notice requirements of ICWA and related California law.

_____
CHAVEZ, J.

We concur:


_____      _____
ASHMANN-GERST, Acting P. J.      HOFFSTADT, J.

22